UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA

v.                                                            Case No. 8:03-cr-445-T-23EAJ

JOSE EUSEBIO VALENCIA-AGUIRRE
_____/


**SENTENCING MEMORANDUM**

Jose Eusebio Valencia-Aguirre returns to district court for re-sentencing after

United States v. Valencia-Aguirre, 130 Fed. Appx. 305 (11th Cir. 2005).

I.

On October 23, 2003, a law enforcement detachment (LEDET) team from the

United States Coast Guard, serving aboard the United States Navy frigate *Samuel B.*

*Roberts*, observed a "fishing vessel" running without navigational lights in the Pacific

Ocean off the coast of Colombia.  Employing standard procedures to establish the "right

of approach," the frigate signaled the unidentified vessel, which ignored the approach

inquiry and attempted unsuccessfully to ram the frigate.  After procuring consent from

the government of Colombia, members of the Coast Guard LEDET team intercepted

and boarded the vessel, identified as *Santa Barbara*.

Secreted in the dry goods storage hold aboard *Santa Barbara* and discovered

after an ion scan and a "space accountability assessment" by the LEDET team were

approximately 1,790 kilograms (almost two tons) of high purity cocaine worth on the

wholesale market not less than $27,000,000 and packaged securely into ninety bales.

The LEDET team arrested the eight crewmen aboard *Santa Barbara*, including Jose

Eusebio Valencia-Aguirre, who was arraigned on October 26, 2003, in Tampa, Florida.

Valencia-Aguirre entered a plea agreement in which he committed to plead guilty to

conspiracy to possess with the intent to distribute five kilograms or more of cocaine

while aboard a vessel subject to the jurisdiction of the United States, which offends 46

Appendix U.S.C. §§ 1903 (a), (g), and (j), and which offense is punishable by

imprisonment between the minimum mandatory term of ten years and the maximum

term of life.

Valencia-Aguirre's base offense level under the United States Sentencing

Guidelines was 38, the offense level applicable to offenses involving 150 kilograms or

more of cocaine, adjusted to 36 because of the "safety valve" provided in Section 5C1.2

of the Sentencing Guidelines.  Valencia-Aguirre's acceptance of responsibility and his

consequent cooperation with law enforcement (although insufficient to trigger a

substantial assistance departure under Section 5K1.1) yielded an additional adjustment

downward to an offense level of 33, which yields in Criminal History Category I a

sentencing range between 135 and 168 months' imprisonment, followed by a term of

supervised release between three and five years.  Valencia-Aguirre received a sentence

of 135 months imprisonment and three years of supervised release.

Valencia-Aguirre unsuccessfully claimed entitlement to a further reduction in his

offense level based on his supposedly "minor role" in this offense.  The circuit court

affirmed the district court's denial of this proposed "minor role" adjustment because

Valencia-Aguirre was unable to distinguish his culpability from that of his fellow

crewmen, a matter for which Valencia-Aguirre bears the burden of proof, and because

the "relevant conduct" for which Valencia-Aguirre is accountable includes only the

cocaine aboard *Santa Barbara* and not the aggregate quantity of cocaine manufactured,

packaged, transported, and delivered by the international criminal conspiracy in which

he was an episodic actor.  Not surprisingly, the prospect of a "minor role" reduction

evanesces as a person undertakes with his confederates for premium pay (by

Colombian standards) a voyage on the high seas for several days furtively transporting

toward the United States a two-ton shipment of high purity cocaine (the weight of which

will probably at least double by dilution before retail sale), all of which advances, despite

a concerted law enforcement effort that includes the armed forces of the United States,

an ongoing international criminal venture dedicated to trafficking massive quantities of

illicit narcotics.[1]  That Valencia-Aguirre is an inconsequential, entirely fungible, unskilled,

and unexceptional laborer without authority, ownership, or even longevity in this criminal

---

[1] Consistent with the en banc decision in United States v. De Varon, 175 F.3d 930 (11th Cir. 1999), the Eleventh Circuit consistently affirms denials of a "minor role" for mere crewmen in this lengthy and persistent series of "boat cases," which involve interdiction on the high seas of ton-quantity cargoes of Colombian cocaine.  United States v. Aguirre, No. 05-12354, 2006 WL 26090 (11th Cir., January 5, 2006); United States v. Bertel, No. 05-12160, 2005 WL 3555942 (11th Cir., December 30, 2005); United States v. Sanchez, No. 05-11772, 2005 WL 3438438 (11th Cir., December 15, 2005); United States v. Lerma, No. 05-11973, 2005 WL 3338282 (11th Cir., December 9, 2005); United States v. Cuero, No. 05-13304, 2005 WL 3338270 (11th Cir., December 9, 2005);  United States v. Astudillo, No. 05-12181, 2005 WL 3338264 (11th Cir., December 9, 2005); United States v. Rosa-Hernandez, No. 05-12634, 2005 WL 3292099 (11th Cir., December 6, 2005); United States v. Bataz Martinez, No. 04-15405, 2005 WL 3292092 (11th Cir., December 6, 2005); United States v. Cuero-Angulo, No. 05-12150, 2005 WL 3159621 (11th Cir., November 29, 2005); United States v. Estupinan, No. 05-11435, 2005 WL 3116630 (11th Cir., November 23, 2005); United States v. Portocarrero-Quintero, No. 05-11919, 2005 WL 3067911 (11th Cir., November 16, 2005); United States v. Estupinan-Yesquan, No. 05-11773, 2005 WL 2673507 (11th Cir., October 20, 2005); United States v. Terriquez, No. 04-15517, 2005 WL 2572393 (11th Cir., October 13, 2005); United States v. Estacio, No. 04-12322, 2005 WL 2499684 (11th Cir., October 11, 2005); United States v. Torres, No. 05-11157, 2005 WL 2456336 (11th Cir., October 6, 2005); United States v. Rivas-Ruiz, No. 04-13056, 2005 WL 2334375 (11th Cir., September 26, 2005); United States v. Hincapie, No. 04-15194, 2005 WL 2219068 (11th Cir., September 14, 2005); United States v. Hernandez, 147 Fed.Appx. 882 (11th Cir. 2005); United States v. Rodriguez, 147 Fed.Appx. 85 (11th Cir. 2005); United States v. Obregon, 146 Fed.Appx. 379 (11th Cir. 2005); United States v. Orovio, 145 Fed.Appx. 654 (11th Cir. 2005); United States v. Alegria, 144 Fed.Appx. 801 (11th Cir. 2005); United States v. Plata-Mora, 140 Fed.Appx. 133 (11th Cir. 2005); United States v. Herea-Martinez, 140 Fed.Appx. 147 (11th Cir. 2005); and the present case, United States v. Valencia-Aguirre, 130 Fed.Appx. 305 (11th Cir. 2005).

enterprise fails under applicable law to justify a reduction in the assessment of his role in transporting this particular illicit cargo.

Because before his arrest Valencia-Aguirre resided with his family in Buenaventura, Colombia, details about his personal history are scarce and largely unverifiable.  However, Valencia-Aguirre reports that he was born in 1951 in Mosquera, Colombia; that he has lived for twenty years in Buenaventura; that he has a wife, an adult son, and several brothers, sisters, and in-laws; that he has worked as a fisherman throughout his life; that he withdrew from school after the third grade to earn money for his family; that he chronically suffers from tetanus, the satisfactory control of which requires periodic medication by injection; that he is not a substance abuser; and that he is persistently and oppressively mired in intractable poverty, along with his Colombian neighbors.

Valencia-Aguirrre was sentenced on July 22, 2004, after Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), announced on June 24, 2004, but before United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), announced on January 12, 2005.  During the six-month interval between Blakely and Booker, the circuit courts of appeals divided on several questions both pertinent to sentencing and arguably affected by Blakely.  See, e.g., United States v. Duncan, 381 F.3d 1070, 1074 (11th Cir. 2004) ("there is considerable disagreement amongst jurists and amongst the circuits on this issue," viz., the application of Blakely to the Sentencing Guidelines), vacated on rehearing, 400 F.3d 1297 (11th Cir. 1005), cert. denied, 126 S. Ct. 432 (2005).  However, pending a more definitive pronouncement from the Supreme Court, the Eleventh Circuit resolved to adhere to the Sentencing Reform Act

- 4 -

of 1984, the United States Sentencing Commission's guidelines, and the Supreme Court's specific disavowal that <u>Blakely</u> invalidated all or part of the federal sentencing regime.[2] <u>United States v. Reese</u>, 382 F.3d 1308, 1312 (11th Cir. 2004) ("We hold that the district courts should continue to sentence pursuant to the Guidelines until such time as the Supreme Court rules on this issue."), <u>cert. granted and remanded</u>, 125 S. Ct. 1089 (2005), <u>on remand</u>, 397 F.3d 1337 (11th Cir. 2005).

<u>Booker</u> appeared during the pendency of Valencia-Aguirre's appeal from his 135-month sentence.  Applying <u>Booker</u> to Valencia-Aguirre, the Eleventh Circuit affirmed in part (the guidelines calculation) but vacated the sentence and remanded for re-sentencing.  The circuit court explained the remand:

> The district court found its hands tied.  It stated that the base level was "undoubtedly high" but that it would adhere strictly to the guidelines. . . . Because Valencia-Aguirre timely raised his constitutional objection in the district court, this Court reviews the constitutional issue <u>de</u> <u>novo</u>, but will not reverse for harmless error. . . .  In light of the district court's comments regarding Valencia-Aguirre's sentence and mandatory guidelines regime we find <u>Booker</u> error in Valencia-Aguirre's sentence.  The government has not (and cannot) show that this error was harmless.

130 Fed.Appx. at 307 (citation omitted).

A careful review of the transcript reveals neither an avowal by the district judge of "strict adherence" to the guidelines nor a comment by the district judge that either the offense level or the sentence was "undoubtedly high."  However, because calculation of the base offense level included a determination of the drug quantity, which was not

---

[2] Although the argument in <u>Blakely</u> starkly implicated the federal sentencing guidelines, <u>Blakely</u>'s notable footnote nine remarks dismissively that, "The Federal Guidelines are not before us, and we express no opinion on them."  124 S. Ct. at 2538, n.9.

determined by a jury beyond a reasonable doubt, the district court observed with respect to the defense's <u>Blakely</u> objection:

> Well, the objection on the base offense level, although undoubtedly highly plausible after <u>Blakely</u> is, for the purposes of this sentence, overruled.

Apparently, the circuit court (mistakenly) construed this passage ("undoubtedly highly plausible") as the requisite "magic words," providing "some indication that the district court would have imposed a lesser sentence had the law permitted it to treat the guidelines as advisory rather than mandatory." <u>United States v. Thompson</u>, 422 F.3d 1285, 1302 (11th Cir. 2005) (Tjoflat, J., specially concurring and stating with disapproval, "We look to what the court said prior to or in the course of imposing a sentence.  We look for what I call 'magic words'.").  The circuit court remanded for the determination of a "reasonable sentence," as contemplated by <u>Booker</u>.[3]

---

[3] The circuit court's opinion also remarks "the district court's comments at sentencing disapproving of the severity of the sentence but conceding that the guidelines dictated the harsh result." 130 Fed.Appx. at 308.  The transcript contains no comments of this sort and none occurred at the hearing. Quite to the contrary, the district judge's unvarying practice accords with Judge Tjoflat's admonition, concurring in <u>Thompson</u>, that:

> When a judge tells a defendant that his sentence is unjust and unfair, the defendant is inclined to believe him.  The defendant is, therefore, unlikely to accept the justice of his punishment and "'enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary.'"  <u>McKune v. Lile</u>, 536 U.S. 24, 36-37, 122 S. Ct. 2017, 2026, 153 L.Ed.2d 47 (2002) (quoting <u>Brady v. United States</u>, 397 U.S. 742, 753, 90 S. Ct. 1463, 1471, 25 L.Ed.2d 747 (1970); <u>see</u> <u>also</u> 18 U.S.C. § 3553(a)(2)(D) . . . .  [B]y openly disparaging the defendant's sentence, the judge fosters disrespect for the rule of law. . . .  If the judge does not respect the law that he applies, then why should society at large?  A judge's role is to apply the law as it is written, not to offer his or her own opinions of its wisdom or fairness.  By his oath of office, the judge has sworn to uphold the law. . . .

422 F.3d at 1303-04.  In an accompanying footnote, Judge Tjoflat concludes:

> Such comments are quintessentially political statements.  I do not suggest that there is never a time or place for them.  The time and place for them, however, is outside the judicial role, in letters or testimony to the Sentencing Commission or Congress.  When a judge makes such statements in specific cases and to specific defendants, the judge's

(continued...)

II.

Of course, since the appearance of <u>Booker</u> the district and circuit courts have

explored the notion of a "reasonable sentence."[4]  As to the district court's determination

---

[3](...continued)
potential for positive influence is not only greatly diminished, but is in fact far outweighed
by the disservice done to rule-of-law values, to the criminal justice system in general, and
to the defendant in particular.

422 F.3d at 1304.

[4] Concerning the circuit court's appellate review of the district court's "reasonable sentence,"
Justice Breyer's opinion confirms that <u>Booker</u> applies to "all cases on direct review" but adds in language
that provokes a spirited contest among the courts of appeals:

That fact does not mean that we believe that every sentence gives rise to a Sixth
Amendment violation.  Nor do we believe that every appeal will lead to a new sentencing
hearing.  That is because we expect reviewing courts to apply ordinary prudential
doctrines, determining, for example, whether the issue was raised below and whether it
fails the "plain-error" test.  It is also because, in cases not involving a Sixth Amendment
violation, whether resentencing is warranted or whether it will instead be sufficient to
review a sentence for reasonableness may depend upon application of the harmless-error
doctrine.

125 S. Ct. at 745.  Exemplars of the resulting disharmony among the circuit courts include <u>United States v.
Antonakopoulos</u>, 399 F.3d 68, 80 n.11 (1st Cir. 2005) ("[A] <u>Booker</u> type error is not a structural error; the
defendant must convince us of prejudice."); <u>United States v. Crosby</u>, 397 F.3d 103, 117 (2d Cir. 2005) ("A
remand for determination of whether to resentence is appropriate in order to undertake a proper
application of the plain error and harmless error doctrines."); <u>United States v. Davis</u>, 407 F.3d 162, 165 (3d
Cir. 2005)(en banc) ("By remanding, we ensure that each defendant to whom <u>Booker</u> applies is sentenced
accordingly."); <u>United States v. Hughes</u>, 401 F.3d 540, 544 (4th Cir. 2005) (finding "plain error" in a pre-
<u>Booker</u> guideline sentence and choosing to "exercise our discretion to notice the error, vacate the
sentence, and remand to the district court for resentencing consistent with [<u>Booker</u>]"); <u>United States v.
Mares</u>, 402 F.3d 511 (5th Cir. 2005) ("Because the defendant did not carry his burden of establishing that
the error affected the outcome of the proceeding, we find no plain error and affirm the sentence."), <u>cert.
denied</u>, 126 S. Ct. 43 (2005); <u>United States v. Oliver</u>, 397 F.3d 369, 373 (6th Cir. 2005) ("the district court
plainly erred by applying the federal sentencing guidelines as mandatory rather than advisory . . ."); <u>United
States v. Paladino</u>, 401 F.3d 471, 484 (7th Cir. 2005) (ordering a limited remand to permit the sentencing
judge to determine whether he would reimpose his original sentence), <u>cert. denied</u>, 126 S. Ct. 106 (2005);
<u>United States v. Pirani</u>, 406 F.3d 543, 546 (8th Cir. 2005)(en banc) ("[A] remand for resentencing is not
required unless the defendant [can] demonstrate . . . that the district court would have imposed a more
favorable sentence under the advisory sentencing guidelines regime mandated by <u>Booker</u>."), <u>cert. denied</u>,
126 S. Ct. 266 (2005); <u>United States v. Ameline</u>, 409 F.3d 1073, 1074 (9th Cir. 2005)(en banc) ("[R]emand
to the district court is appropriate for the purpose of ascertaining whether the sentence imposed would
have been materially different had the district court known that the sentencing guidelines were advisory.");
<u>United States v. Gonzalez-Huerta</u>, 403 F.3d 727, 738 (10th Cir. 2005)(en banc) ("[T]he District Court's
mandatory application of the Guidelines was not 'particularly egregious' or a 'miscarriage of justice.'"), <u>cert.
denied</u>, 126 S. Ct. 495 (2005); <u>United States v. Rodriguez</u>, 398 F.3d 1291, 1306 (11th Cir. 2005) (holding
(continued...)

of a "reasonable sentence," Justice Breyer's opinion on the "remedial question" in

Booker confirms only that:

> [T]he Sentencing Commission remains in place, writing Guidelines,
> collecting information about actual district court sentencing decisions,
> undertaking research, and revising the Guidelines accordingly. . . .  The
> district courts, while not bound to apply the Guidelines, must consult those
> Guidelines and take them into account when sentencing. . . .  The courts of
> appeals review sentencing decisions for unreasonableness.

125 S. Ct. at 767 (citations omitted).  Booker's prescription for a "reasonable sentence"

and the inclusion in the calculus of an unspecified evaluation by the district court of the

factors arrayed in 18 U.S.C. § 3553(a) leave initially to the district and circuit courts the

formidable task of elaborating a practical understanding of the "reasonable sentence."

An example typical of the circuit court's necessarily incremental approach to expounding

the notion of a "reasonable sentence" is the early United States v. Webb, 403 F.3d 373,

383-84 (6th Cir. 2005), which states:

> [A] sentence is unreasonable when the district judge fails to "consider" the
> applicable Guidelines range or neglects to "consider" the other factors listed
> in 18 U.S.C. § 3553(a) and instead simply selects what the judge deems an
> appropriate sentence without such required consideration. . . .  We decline,
> however, to define rigidly at this time either the meaning of reasonableness
> or the procedures that a district judge must employ in sentencing post-
> Booker.  Instead we believe it prudent to permit a clarification of these
> concepts to evolve on a case-by-case basis at both the district court and
> appellate levels.  Any specific clarification of the reasonableness standard
> is also unnecessary in this case, as we conclude that there is nothing in the
> record which suggests that the district court's sentencing determination was
> unreasonable.

(citation omitted).

---

[4](...continued)
that the defendant necessarily bears the burden of satisfying the third prong of the plain error test), reh'g
denied, 406 F.3d 1261 (11th Cir. 2005), cert. denied, 126 S. Ct. 2935 (2005); United States v. Coles, 403
F.3d 764, 765 (D.C. Cir. 2005) (ordering a limited remand to permit the district court to determine whether
it would reimpose its original sentence).

From the vantage of a district court searching for the "reasonable sentence," cases such as Webb help little (in the same manner that Booker helped little) and reveal only that the circuit court expects the district court to comply with the Supreme Court's explicit instruction to "consider" the Sentencing Guidelines--not a surprising expectation. But Webb and numerous other cases understandably foundered in the attempt to state explicitly the content of the elusive "reasonable sentence" because after nearly twenty years of guidelines sentencing, after hundreds of judicial opinions construing the guidelines, after scores of scholarly articles appraising the supposed virtues and claimed vices of the guidelines, after the accumulation and evaluation of volumes of data by the Sentencing Commission, and after protracted deliberation by Congress, including the investment of a mountain of public resources, the Supreme Court abruptly disengaged the most thorough and carefully considered regime of criminal sentencing in history and (by the margin of one vote) substituted a two-word regime of criminal sentencing (perhaps the most abbreviated in history)--the regime of the "reasonable sentence," now informed only to some indeterminate and controversial extent by the Sentencing Guidelines.

After Booker, the courts began promptly to define the protocol of post-Booker sentencing, aware that the duration of the "reasonable sentence" regime remained uncertain.[5]  The prescriptions of the Eleventh Circuit most immediately govern

---

[5]   As Justice Breyer noted, "The ball now lies in Congress' court."  125 S. Ct. at 768.  Of course, in the realm of the federal criminal law (and others, as well, in a constitutional republic), the "ball" was and is always in "Congress' court" (a fact the judiciary is wise to keep in the forefront).  Congress prescribes crimes and penalties, creates courts and judgeships, grants and delimits jurisdiction, and otherwise enforces its will when and where it will.  As Professor Bowman aptly but unenthusiastically characterizes the reach of congressional authority:

(continued...)

sentences in this district court, and in <u>United States v. Shelton</u>, 400 F.3d 1325 (11th Cir.

2005), the Eleventh Circuit offered initial direction to the district court in finding a

"reasonable sentence":

> After <u>Booker</u>, the Federal Sentencing Guidelines remain an essential
> consideration in the imposition of federal sentences albeit along with the
> factors in § 3553(a).  A sentencing court under <u>Booker</u> still must consider
> the Guidelines, and such consideration necessarily requires the sentencing
> court to calculate the Guidelines sentencing range in the same manner as
> before <u>Booker</u>.  Indeed, the factors the Sentencing Commission was
> required to use in developing the Guidelines are a virtual mirror image of
> the factors sentencing courts are required to consider under <u>Booker</u> and
> § 3553(a).  The change wrought by <u>Booker</u> is the excising of the mandatory
> nature of the Guidelines.

400 F.3d at 1333, n.9.  Remanding for re-sentencing in accord with <u>Booker</u>, the circuit

understandably forbore, in the prudent spirit of <u>Webb</u>, to undertake explicit instruction to

the district court with respect to the particulars of a "reasonable sentence," which

particulars were as unknown to the circuit court as to the district court.  In conclusion,

the circuit court promised more later:

> Although the district court's comments convince us that on remand the
> district court will sentence below the range indicated by the Guidelines, we
> do not know exactly what sentence it will impose after consulting the
> § 3553(a) factors.  Until we find out, we will not attempt to decide whether a
> particular sentence below the Guidelines range might be reasonable in this
> case.  If there is an appeal of the actual post-remand sentence which raises
> that issue, we can decide it then.

---

[5](...continued)
The confluence of the foregoing points means that Congress can define virtually any
objectionable conduct as a crime and impose virtually any punishment it chooses for that
conduct and that the federal courts presently possess virtually no direct constitutional
control over Congress's power to do so.

Frank O. Bowman, III, <u>Mr. Madison Meets a Time Machine:  The Political Science of Federal Sentencing
Reform</u>, 58 Stan. L. Rev. 235, 242 (2005).

400 F.3d at 1334, n.11.  United States v. Crawford, 407 F.3d 1174, 1180 (11th Cir.

2005), expands somewhat on Shelton and expressly retains the pre-Booker

requirement of an accurate guidelines calculation:

> In other words, as was the case before Booker, the district court must
> calculate the Guidelines range accurately.  A misinterpretation of the
> Guidelines by a district court "effectively means that [the district court] has
> not properly consulted the Guidelines . . . ."  After it has made this
> calculation, the district court may impose a more severe or more lenient
> sentence as long as the sentence is reasonable, see Booker, 125 S. Ct. at
> 767 ("The courts of appeals review sentencing decisions for
> unreasonableness."), but the requirement of consultation itself is
> inescapable.

(citation omitted).

In United States v. Winingear, 422 F.3d 1241 (11th Cir. 2005), the district court

assessed a guidelines sentence and declined to depart downward, despite the

defense's demands on behalf of "reasonableness" that the sentence account for six

months the defendant had served in state prison for resisting and threatening to murder

the arresting officers.  Applying the pre-Booker notion that the refusal to depart is not

reviewable, the circuit court offered another increment of insight respecting a

"reasonable sentence" and deflected a claim by the United States that a guideline

sentence is "per se reasonable":

> The government urges us to hold that sentences within the Guideline range
> are per se reasonable, but we need not address whether or how much
> deference is owed sentences within the applicable Guideline range to
> determine that Winingear's sentence was reasonable.  The district court
> imposed a sentence one-tenth the length of the twenty-year statutory
> maximum sentence for mail fraud that does not affect a financial institution.
> 18 U.S.C. § 1341.  Winingear defrauded 21 people of a total of $19,600,
> had multiple previous convictions, committed this crime while still under
> sentence for a previous crime, violated his bond, and threatened to murder
> arresting officers as he fled from them.  The district court took care that its
> sentence provided Winingear with needed medical care.  In the light of the

factors outlined in section 3553(a), the sentence of the district court was reasonable.

422 F.2d at 1246.  The circuit court in Winingear attributes "light" to the factors in Section 3553(a) but, again deterred by the immense task implicit in the undertaking, defers explaining how one might extrapolate or demonstrate the reasonableness of Winingear's twenty-one month sentence from the factors displayed at Section 3553 or, on the other hand, how one might either prove or disprove the reasonableness of any sentence (whether greater or lesser) by consulting the factors displayed at Section 3553.  See also, United States v. Scott, 426 F.3d 1324 (11th Cir. 2005).

More recently, United States v. Talley, No. 05-11353, 2005 WL 3235409 (11th Cir.,  December 2, 2005), describes sentencing as a two-step process, beginning with a consultation of the Sentencing Guidelines, including the correct calculation of an advisory guidelines sentence, and concluding with consideration of the factors arrayed at Section 3553(a).  Talley confirms that, although the district court must consider the Section 3553(a) factors, the district court "need not discuss each of them" because "an acknowledgment by the district court that it has considered the defendant's arguments and the factors in Section 3553(a) is sufficient under Booker."  2005 WL 3235409 at *2. Rejecting the United States' argument that a guidelines sentence is "per se reasonable," the circuit court confirms the appellant's burden in an appeal from a procedurally proper sentence (that is, a sentence during the determination of which the district court correctly computed the advisory guidelines sentence and confirmably considered both the Section 3553(a) factors and any particular claim by the defendant of unreasonableness in the sentence):

> Although either a defendant or the government can appeal a sentence within the Guidelines range and argue that it is unreasonable, ordinarily we would expect a sentence within the Guidelines range to be reasonable. After Booker, our ordinary expectation still has to be measured against the record, and the party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both that record and the factors in Section 3553(a).

2005 WL 3235409 at *4.  Talley speaks of the "ordinary expectation" of the reasonableness of a guidelines sentence and attaches to the appellant the burden of showing unreasonableness, again without discussing how any litigant, governmental or non-governmental, public or private, corporate or individual, great or small, might demonstrate convincingly the reasonableness or unreasonableness of any sentence, whether within or without the guidelines, by consulting Section 3553(a).

In United States v. Williams, No. 05-11318, 2005 WL 3193855 (11th Cir., November 30, 2005), after the panel unanimously remanded for re-sentencing because of an arguably flawed interpretation of the (not typically perplexing) word "any" in Section 2K2.1(c)(1), Judge Carnes added a concurrence, in which he bristles noticeably about the "sword dance" of sentencing pursuant to the guidelines, "some provisions of which are mind-numbingly complex and others of which are just mind-numbing."  2005 WL 3193855 at *5.  Provocative and fluent as always, Judge Carnes notes the irony of "vacating an unquestionably reasonable sentence" and remanding for re-sentencing because of an error not actually prejudicial to the defendant.  As Judge Carnes explains:

> The reality is, however, that our reversals stem from interpretation of the guidelines, not from the unreasonableness of the sentences that district courts are imposing.  Without much exception, in the post-Booker world we send cases back for resentencing because of some difference of opinion

> about the advice that the guidelines provided the district court, not because we think the sentence imposed is unreasonable.
>
> . . . .
>
> Therein runs a thread of madness through the method now in place.  We review and decide close, hair-splitting interpretive issues arising from guidelines that are only advisory, and we set aside sentences even though the district court, once its "misunderstanding" of the guidelines is corrected, is free to impose the same sentence, and usually will do so.

2005 WL 3193855 at *5-6.

In fact, as Judge Carnes notes in understandable frustration, the appellate exertion continues to focus on guidelines interpretation and application, even though an erroneous guidelines calculation corrected on appeal may not affect on remand the district court's assessment of a "reasonable sentence"--a "thread of madness" in Judge Carnes' view.  Of course, this focus by the circuit courts on the guidelines is entirely understandable based upon the inviting concreteness and familiarity of the guidelines calculation over against the dauntingly ethereal and elusive concept of a "reasonable sentence," about the details of which the circuit courts join the district courts in a viscous uncertainty.

However, Judge Carnes continued his concurrence in Williams to include a suggestion to district judges:

> [I]n this case if the district court had stated that regardless of how the guidelines relevant conduct issue was resolved, it would consider the prior assault under Section 3553(a)(1) & (2)(c) and on that basis would still impose the same 96-month sentence, we would not have to send this case back for more sentence proceedings.  The sentencing court might have stated that its ruling on the relevant conduct issue resulted in a guidelines range of 77 to 96 months, but that if it was wrong about that and the range was only 27 to 33 months, the sentence would still would [sic] have been 96 months based on the Section 3553 factors.  On that basis we could and would have affirmed.

2005 WL 3193855 at *6.  This observation indicates that the circuit court (or, at least, a circuit judge with formidable powers of analysis) perceives in the difference between 27 to 33 months, on the one hand, and 77 to 96 months, on the other, no attribute that would trigger appellate disapproval under the <u>Booker</u> regime of sentencing.  Given the ratio of about one to three between these two ranges and assuming Judge Carnes advises correctly in his concurrence, this level of unaccountable disparity in the range of a "reasonable sentence" (and the effective range widens because symmetry suggests the potential for an equivalent migration both above and below the advisory range of 77 to 96) perhaps exceeds the disparity that Congress will accept, if applying a standard even approaching the standard that impelled enactment of the Sentencing Reform Act of 1984.

III.

Although the pre-1984 sentencing regime drew much criticism throughout its long life, none contributed more definitively to the demise of that regime than Judge Marvin E. Frankel's little classic, entitled (rather pointedly) <u>Criminal Sentences:  Law Without Order</u> (Hill and Wang, New York, 1972).  Speaking from the favorable vantage of an experienced, respected district judge (with a decidedly robust rhetorical touch), Judge Frankel lambasted the regnant scheme of sentencing in the United States, the most notorious feature of which he identified as the invidious and ungoverned disparity among sentences visited upon similarly situated offenders, that is, those committing similar crimes and presenting comparable histories.  The virtually complete absence of appellate review of sentences aided and abetted this oppressive regime, as Judge Frankel saw things.  Judge Frankel aimed his withering broadside at the entirety of

contemporary criminal law, especially sentencing, toward which he deployed his most pointed barbs:  "gross evils and defaults," "arbitrary, cruel, and lawless," "unthinkable in a 'government of laws,'" "unchecked and sweeping powers," "wild array of sentencing judgments," "wide-open, uncharted, standardless discretion of the judge," "untrained, untested, unsupervised men armed with great power," "tyrannical."  Judge Frankel observed that "irrational disparities are real and pervasive," creating "baleful results."

Judge Frankel's polemic caught the attention of many, including Senator Edward M. Kennedy, who became the principal sponsor of the Sentencing Reform Act of 1984, a bill supported by "liberals" and "conservatives" alike, proposed by Senator Kennedy, a "liberal" senator from Massachusetts, and signed by President Reagan, a "conservative" president from California.  (The pertinent history is admirably and succinctly presented in Fear of Judging [Univ. of Chicago, 1998] by Judge Jose A. Cabranes and Professor Kate Stith.)  Answering resoundingly Judge Frankel's criticism that "[t]he problem has been too little law, not too much," the Sentencing Reform Act of 1984 begat the Sentencing Commission; which begat the Sentencing Guidelines; which became effective on November 1, 1987; which survived an early constitutional assault in Mistretta v. United States, 488 U.S. 361, 109 S. Ct. 647, 102 L.Ed.2d 714 (1989); and (with ample law, indeed) which closely constrained the imposition of federal sentences until Booker.[6]

_____

[6] Although a principal catalyst of reform, Judge Frankel developed and retained reservations about the structure and content of the Sentencing Commission/Sentencing Guidelines regime.  Marvin E. Frankel, Sentencing Guidelines:  A Need for Creative Collaboration, 101 Yale L. J. 2043 (1992).  See also Jon O. Newman, Remembering Marvin Frankel:  Sentencing Reform But Not These Guidelines, 14 Fed. Sent'g. Rep. 319 (2002), a tribute and commentary after Judge Frankel's death on March 3, 2002.

In the aftermath of <u>Blakely</u>, Senators Hatch, Kennedy, and Feinstein submitted to the Supreme Court in <u>Booker</u> a brief <u>amici</u> <u>curiae</u> in support of the "continued application of the federal sentencing guidelines as a whole."  The senators emphatically advised preservation of the congressionally engineered sentencing structure:

> The 1984 Act is the result of the most careful examination that Congress and, indeed all three Branches collectively have ever devoted to the federal sentencing system.  The Act sought to eliminate the gross disparities that had proliferated under the prior indeterminate sentencing system-- disparities that in at least some cases were believed to stem from the improper consideration of race and other illegitimate factors.  Nearly two decades later, debate is ongoing in the Halls of Congress and the other Branches on ways of improving the sentencing system, but--especially when viewed against the backdrop of the intolerable state of affairs that existed before 1984--bipartisan support continues to exist for the basic structure of the sentencing guidelines system created by the 1984 Act and the core principles on which it rests.  In our representative Republic, only the clearest constitutional command should be cause for dismantling such a considered legislative effort.

"Brief for the Honorable Orrin G. Hatch, Honorable Edward M. Kennedy, and Honorable Dianne Feinstein as amici curiae in support of petition" at 25-26.

The predominant feature of the pre-1984 sentencing regime, the feature that Judge Frankel indicted so tellingly and the feature that catalyzed bipartisan reform in Congress, was the disparity in sentencing caused by the district court's unreviewable discretion to sentence anywhere within the statutory range.  The senators' amicus brief summarized the pertinent history:

> At the same time, while appellate jurisdiction initially was available to correct egregious disparities such as unduly harsh sentences, that changed in 1891.  Courts interpreted an 1891 statute (Act of Mar. 3, 1891, ch. 517, 26 Stat. 826) to have impliedly repealed appellate jurisdiction over sentencing.  See <u>Freeman v. United States</u>, 243 F. 353, 357 (9th Cir. 1917), <u>cert.</u> <u>denied</u>, 249 U.S. 600 (1919).  And soon the "rule" was "firmly established * * * that the appellate court has no control over a sentence which is within the limits allowed by a statute."  <u>Dorszynski</u>, 418 U.S. at

440-441 (quoting <u>Gurera v. United States</u>, 40 F.2d 338, 340-341 (8th Cir. 1930)); <u>see</u> <u>id.</u> at 441  ("[I]f a judge imposed a sentence within that range, his exercise of discretion * * * was not subject to challenge [on appeal]."). The result was that in the United States--unlike every other "'nation in the free world'"--"the 'discretion of the judge . . .  in (sentencing) matters [was] virtually free of substantive control or guidance.'" <u>Id.</u> at 440 n.14 (quoting law reviews).

Amicus brief at 8-9.  In short, perforce the Sentencing Reform Act of 1984, the regime of inadequately bounded sentencing discretion in the district court was not merely replaced; in answer to the accusation of "too little law," the regime of discretionary sentencing was emphatically repudiated and rejected by resolute congressional action.[7] Safe to say, discretionary sentencing is gone forever and, given the evidence from its history, deserves to be gone forever.

In sum, faced with an ungoverned sentencing structure and the resulting disparate (and, perhaps, episodically invidious) sentences, Congress imposed the Sentencing Reform Act of 1984, a coordinating paradigm that brought predictability (arguably too much), deliberation (through the forums offered by both Congress and the Sentencing Commission), and a governing component of objectivity to sentencing. Notwithstanding the many imperfections noted by the many critics over the many years of the Sentencing Guidelines, the guidelines overcame the principal defect of the predecessor system,[8] described by the senators' amicus brief as follows:

---

[7] The course of several years of congressional deliberation and the concurrent passiveness of the judiciary, including the Judicial Conference of the United States, is carefully recounted in Kate Stith and Steve Y. Koh, <u>The Politics of Sentencing Reform:  The Legislative History of the Federal Sentencing Guidelines</u>, 28 Wake Forest L. Rev. 223 (1993).

[8] <u>But see</u> Albert W. Alschuler, <u>Disparity:  The Normative and Empirical Failure of the Federal Guidelines</u>, 58 Stan. L. Rev. 85 (2005).

> That discretionary sentencing system produced astounding disparities among the sentences that were imposed on defendants convicted of the same offense with similar backgrounds within different judicial districts across the country and even among different judges in the same district. In addition, studies indicated that the disparities that proliferated under this sentencing system not only were arbitrary, but, in at least some cases, were based on the consideration of race, gender, and other illegitimate factors.

Amicus brief at 4.  The principal task now is to define "reasonable sentence" in a manner calculated not to impinge the (tenuous and strange[9]) requirements of <u>Booker</u> but calculated neither to repair to the rejected and disreputable regime of unfettered discretion nor to deploy a substitute regime that permits an incremental retreat toward disorder and disparity.

## IV.

Addressing tentatively the question of a "reasonable sentence," some courts cautiously conclude that the calculated guidelines sentence is "<u>per se</u> reasonable" in each instance; other courts conclude differently; some courts avoid the question.[10]  So,

---

[9] Professor Bowman finds the <u>Booker</u> regime "doctrinally peculiar" and perhaps "politically unsustainable over the long term."  Frank O. Bowman, III, <u>Mr. Madison Meets a Time Machine:  The Political Science of Federal Sentencing Reform</u>, 58 Stan. L. Rev. 235, 257, 262 (2005).  Professors Allen and Hastert wonder if <u>Booker</u> represents another doctrinal misstep, from which a retreat will occur as the Supreme Court appreciates the treacherous course chosen (as the professors put it, perhaps altogether too tartly, when "ignorance [is] checked by good sense").  Ronald J. Allen and Ethan A. Hastert, <u>From Winship to Apprendi to Booker:  Constitutional Command or Constitutional Blunder?</u>, 58 Stan. L. Rev. 195, 198 (2005).  Professor Klein finds that both the opinion for the "merits majority" and the opinion for the "remedial majority" in <u>Booker</u> "lack cohesion" and that the latter is "inexplicable on its face."  Susan R. Klein, <u>The Return of Federal Judicial Discretion in Criminal Sentencing</u>, 39 Val. U. L. Rev. 693, 714-15 (2005).

[10] For a survey of the divergent opinion among the courts of appeals, <u>see</u>. <u>e.g.</u>, <u>United States v. Crosby</u>, 397 F.3d 103, 115 (2d Cir. 2005) (refusing to "fashion any per se rules as to the reasonableness of every sentence within an applicable guideline or the unreasonableness of every sentence outside an applicable guideline"); <u>United States v. Gonzalez</u>, 134 Fed. Appx. 595, 598 (3d Cir. 2005) ("Although the Sentencing Guidelines are not mandatory, sentences within the prescribed range are presumptively reasonable."); <u>United States v. Bartram</u>, 407 F.3d 307, 1313 (4th Cir. 2005) (defining "reasonable under ordinary English usage as: being in agreement with right thinking or right judgment"); <u>United States v.</u>

(continued...)

whether a properly calculated guidelines sentence is "presumptively" or "per se" or "prima facie" a reasonable sentence has persisted in the circuit courts without definitive consensus, the prospect for which is explicitly threatened by the view that, assuming a declaration that a guidelines sentence is presumed reasonable, the guidelines might again feature an unconstitutionally "mandatory" aspect, impinging the requirements of Booker.[11]

The search for meaning in the phrase (now a command) "reasonable sentence" causes to recur the vagaries of definition in language (Eliot's "intolerable wrestle with words and meanings").  The particular issue is illustrated by the question, "Is a hundred degrees Fahrenheit a reasonable temperature?"  To abbreviate a long story, this apparently simple question is unanswerable unless some benchmark is available,

---

[10](...continued)
Mares, 402 F.3d 511, 519 (5th Cir. 2005) ("[I]t will be rare for a reviewing court to say . . . a sentence [within a properly calculated Guidelines range] is 'unreasonable.'"); United States v. Webb, 403 F.3d 373, 385 n.9 (6th Cir. 2005) ("[W]e decline to hold that a sentence within a proper Guidelines range is per se reasonable."); United States v. Mykytiuk, 415 F.3d 606 (7th Cir. 2005) (holding that "any sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness"); United States v. Lincoln, 413 F.3d 716, 717 (8th Cir. 2005) (holding that the defendant's sentence "was within the guidelines range" and therefore "presumptively reasonable"); United States v. Winingear, 422 F.3d 1241, 1246 (11th Cir. 2005) ("The government urges us to hold that sentences within the Guidelines range are per se reasonable, but we need not address whether or how much deference is owed sentences within the applicable Guideline range to determine that Winingear's sentence was reasonable.").

[11] Judge Bataillon provided immediate post-Booker expression of this reservation in United States v. Huerta-Rodriguez, 355 F. Supp.2d 1019, 2026 (D. Neb. 2005):

> The court cannot adopt the position advanced by the government that a criminal sentence should fall within the Guidelines range, absent highly unusual circumstances.  Such wholesale application of the Guidelines as per se reasonable effectively converts the now-advisory guidelines to mandatory guidelines triggering unconstitutionality in the same way the Washington guidelines did in Blakely. . . .  Similarly, the court will not preserve a "de facto" mandatory Guidelines scheme by affording the Guidelines a presumption of reasonableness in every case.  Such an interpretation of the Booker remedy would circumvent Booker's substantive holding, and would defy the directive that the court consider the factors in 18 U.S.C. § 3553(a).

(citation omitted).

without which benchmark the word "reasonable" remains forever indistinct; "reasonable" simply lacks definiteness in isolation.  (A hundred degrees is pleasantly cool compared to the surface of the sun, oppressively hot compared to a winter afternoon in Thule, and quite normal, neither hot nor cold, for a summer day in Riyadh.  Whence "reasonable"?)

Similarly, when measuring a criminal sentence, the term "reasonable" lacks definition in isolation.  Without more, no mere mortal can mount a dispositive argument (or even an informed argument) that a sixty-month sentence in a particular case of, say, the sale of methamphetamine is either "reasonable" or "unreasonable" (although highly credentialed persons may cling to both positions).  Again, stated quite simply, the term "reasonable" is rendered meaningful only when appraised in light of some standard and in a detailed context of fact.

When a criminal sentence is the issue, the term "reasonable" principally refers (in a civilized society) to the attribute of duration, measured in units of time.  Whether a greater or fewer number of units is a "reasonable" number of units is not ascertainable without some standard or boundary or some other comprehensible frame of reference.  Without this reference, the question of the abstract "reasonableness" of a sentence immediately and hopelessly mires in irresolvable arguments arising from, among other things, the several theories of criminal punishment, which have competed earnestly for hundreds of years without approaching a resolution.  Discussing Section 3553(a), Judge Posner admirably encapsulates the problem in United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005):

> It is not at all helpful that many of the factors are vague and, worse perhaps, hopelessly open-ended.  How far, for example, is the judge to delve into the "characteristics" of the defendant?  How far is he to go in investigating the possibility of "unwarranted sentencing disparities"?  Must he elaborate upon the meaning of "promote respect for law"?  And must he discuss all the rival theories of "just punishment" (retributive, deterrent, rehabilitative, incapacitative)?

These persistent imponderables will not relent to the ruminations of some district judge or even a panel of circuit judges or, finally, five or more Supreme Court justices--the "correct" theory underlying the practice of criminal punishment has proven durably elusive.

Nonetheless, the criminal justice system must assess in each case a definite sentence of some specific duration, ignoring the sundry arguments arrayed by the detractors against the reasonableness of that duration and forsaking forever the sundry benefits claimed by boosters for all the sentences of every other possible duration. Acknowledging that the philosophers will quibble and rankle incessantly throughout all tomorrows (as during all yesterdays) and wrestling the need nonetheless to specify a sentence during today, the Constitution of the United States employs the practical device of investing in Congress, acting by the consent of the governed, the legislative power to describe the elements of a crime and fix the penalty that from time to time seems sufficient and just in light of the prevailing circumstances as assessed by the admittedly fallible humans elected to the House of Representatives and the Senate.[12]

---

[12] Persons combining to establish government by consent of the governed have provided for the popular resolution of irresolvable issues since the earliest days, allowing always that today's preferred resolution foreseeably will change from time to time perforce popular will.  For example, the Mayflower Compact creates a "civil Body Politick" to "enact, constitute, and frame, such just and equal Laws . . . , from time to time, as shall be thought most meet and convenient for the general Good of the Colony . . . ."

(continued...)

Oddly, after decades of allowing a district judge (one from among a second group of fallible humans) to impose any sentence within the statutory range fixed by those fallible humans in Congress and after the last twenty years of allowing only a narrow range of sentences within precisely delineated guidelines (promulgated by still another group of fallible humans), the present regime triggered by Booker (announced by yet another group of fallible humans) requires a "reasonable sentence," a regime that plainly demands some marker (presumably fixed by fallible humans, as well) by which to measure reasonableness.[13]   A statutory range (say, between five and twenty years) presents only a wide and undifferentiated outward boundary, but Congress and the President in 1984 emphatically insisted on a conspicuous and bold marker, something much more consistent and more predictable than just any sentence a district judge announces within the statutory range.  In the Sentencing Reform Act of 1984 Congress and the President provided the Sentencing Commission and the Sentencing Guidelines.[14]

---

[12](...continued)
That plan, which cleverly anticipates tomorrow's grumbling about yesterday's (and today's) consensus, proved to offer considerable merit as a practical means of managing the unmanageable and conspicuously persists into today.

[13] The present "reasonable sentence" regime under Booker joins the pre-1984 regime of unguided sentences and the pre-Booker regime of closely guided sentences (and the post-Booker regime, when it arrives) as a subject of critical observation by the legal professoriate, who should remember that they are also fallible human beings, at least some of whose opinions are surely wrong.  Because a fair and amiable respect (by one fallible human toward another) enhances the receptiveness of the scholar's audience to the scholar's criticism and because temperate and scholarly criticism immeasurably benefits the commonweal, best avoided are unbecoming and gratuitous jabs such as the recently published comment that "'prestigious' is hardly the adjective most observers of [the] federal criminal justice system would chose to capture the intellectual and political status of the current commission."  Robert Weisberg and Mark L. Miller, Sentencing Lessons, 58 Stan. L. Rev. 1, 21 (2005).  Prestige is not the final measure of wisdom, and humility is a quality with which some could use more familiarity.

[14] Some appear to doubt that Congress rightfully predominates in criminal law matters.  In discussing the majority opinion in Booker, Professor Klein "suggests" that "this five justice block [note

(continued...)

The Sentencing Guidelines arrive at a specific sentence by describing a matrix of sentencing ranges and permitting migration among offense levels and criminal history categories based on a set of attributes to which a description is assigned by the guidelines and to which an incremental, imprisonment consequence attaches.  In contrast, <u>Booker</u> presents the necessity to ascertain whether a specified sentence is "reasonable" when appraised in juxtaposition to the theoretical, calculated guidelines sentence, which itself describes completely no actual criminal episode and no single criminal, but provides only a set of characteristics and a set of consequent results that approximate, to some indeterminate extent, an actual crime and criminal.  Viewed one way, the guidelines express only a range of imprisonment consequences that attach to a hypothetical set of circumstances that are fewer and more general than all the circumstances of any one criminal episode or all the characteristics of any one criminal. This is no more nor less than the guidelines' providing as a datum of comparison the fact of a hypothetical sentence assessed by a hypothetical judge in a hypothetical case. Many systems for compiling sentencing data for comparison and many standards for comparison can be imagined; a governable system of assessing a "reasonable sentence" without any standard for comparison is unimaginable.

The issue for the district court in the first instance is whether the circumstances of the offense at issue and the characteristics of the offender at hand mitigate, aggravate, distinguish, or supersede the presumed but confined circumstances and attributes

_____

[14](...continued)
omitted] hoped to revive judicial discretion in federal sentencing in the wake of what they considered the rude, disruptive, and unwise coup over criminal sentencing that Congress accomplished in the Sentencing Reform Act of 1984."  Susan Klein, <u>The Return of Federal Judicial Discretion in Criminal Sentencing</u>, 39 Val. L. Rev.  693, 695 (2005).

arrayed illustratively in the guidelines.  But, because the guidelines neither fully nor dispositively prescribe a sentence for any particular offender or offense, <u>Booker</u> presents no occasion to announce any attribute of the theoretical guidelines sentence, including whether it is "<u>per</u> <u>se</u>" or "presumptively" or "<u>prima</u> <u>facie</u>" reasonable.[15]  The calculated guideline sentence is the essential but theoretical marker by which some actual sentence is measured and without which the "reasonable sentence" regime will descend inevitably toward disorder; the calculated guideline sentence, a mere abstraction, presents an event for comparison and measurement, not an event requiring characterization.  (Similarly, a twelve-inch ruler provides a means to measure length and offers no occasion to characterize the ruler itself or its twelve inches as presumptively satisfactory or reasonable as one foot, which by changing convention could have been longer or shorter; the "twelve inch-ness" of a foot is neither "<u>per</u> <u>se</u>" reasonable nor "<u>per</u> <u>se</u>" unreasonable.)

V.

Although a "reasonable sentence" and the calculated guidelines sentence, because not identical, intermittently diverge, a large intersection occurs between the sets described by the two functions.  Again, although one is not invariably the other, the degree of proximity, including frequent coincidence, of the two expedites an assessment of the qualities of one assayed in regard to the other.

---

[15] Perhaps for describing the calculated guidelines sentence, the phrase "reasonable as far as it goes" or, more economically, "conditionally reasonable," "contingently reasonable," or "reasonable to the extent specified," is more accurate and less mischievous than "<u>per</u> <u>se</u> reasonable."  In all events, the selection of a descriptive characterization remains superfluous.

First, as courts have already determined, a reasonable sentence is informed by an advisory sentence correctly calculated under the Sentencing Guidelines, which provide the essential benchmark in comparison to which the notion of reasonableness is given meaning and sense (one might as well attempt to describe the "northerliness" of some point on the earth without reference to the equator as to describe reasonableness without a benchmark such as the Sentencing Guidelines).  Implicit in the necessity of an advisory sentence is recognition that the Sentencing Commission, in promulgating guidelines in accord with the statutory mandate, has deliberated and resolved for purposes of a "reasonable sentence" the application of the factors arrayed at 18 U.S.C. § 3553(a) to the extent that the Sentencing Commission has promulgated a guideline or policy statement addressing a specific attribute of a particular offense or offender.  See United States v. Wilson, 350 F. Supp.2d 910 (D. Utah 2005) (Cassell, J.), and United States v. Wilson, 355 F. Supp.2d 1269 (D. Utah 2005) (Cassell, J.).  In other words, because Congress instructed the Sentencing Commission to evaluate and apply 18 U.S.C. § 3553(a) as an essential element of the effort to eliminate disparity and other sentencing injustice, the Sentencing Commission's determination of policy is a necessary bound within which a sentencing court must assess each criminal sentence. This leaves the district court unfree to visit anew each tenet of federal sentencing policy on the occasion of each sentencing and, most especially, unfree to implement in the well of the judge's court the judge's discrete designs for criminal justice, informed primarily by the judge's singular doctrines.  Because each of several hundred district judges might enjoy the same liberty, this bold regime would promote dizziness in the

judiciary and trigger a sudden injection of statutory discipline from an intensely unamused Congress.

Second, although a correctly calculated guidelines sentence invariably informs a "reasonable sentence" and although the announced and received policies of the Sentencing Commission warrant deference by the sentencing judge (who, although famously "independent," is not, after all, "sovereign"), the sentencing judge may migrate away from the advisory sentence to the extent that some articulable (and articulated), singular, and urgent attribute of a particular offense or offender creates a compelling centrifugal force to which the calculated guidelines sentence justifiably, but only episodically, yields.  By definition, a "reasonable sentence" is not established in contravention and defiance of settled congressional or Sentencing Commission policy, both of which command deference in sentencing.  To avoid unacceptable disparity, conformity to announced policy is an irreducible minimum (on which Congress predictably will insist).

In addition to increasing disorder, an individual judge's visiting anew the factors arrayed in 18 U.S.C. § 3553(a) is an impossible undertaking because, as Judge Posner observes in Dean, a definitive exploration of the themes in section 3553(a) is rendered forever elusive by "the indeterminate and interminable character of inquiry into the meaning and application of each of the 'philosophical' concepts in which section 3553(a) abounds," a task to which no judge is equal.  414 F.3d at 729.  The "seriousness of the offense," requisite "respect for the law," "just punishment," "adequate deterrence," "protect[ion of] the public," and the other matters arrayed at section 3553(a) are a theoretical rendition of the supposed attributes of the (mythological) perfect sentence, a

shorthand surrogate for all the arguments about punishment that have raged over time without resolution.  In reality, Section 3553(a) differs not a whit from Congress's (hypothetically) directing the Internal Revenue Service to "collect tax at a fair rate" and stating in a revenue analog to section 3553(a) that the rate "shall be no more than required to pay for necessary and beneficial public programs, shall be disproportionally burdensome to neither the poor nor the rich but reach all those able to pay, shall not be so great as to depress productive and publicly desirable economic activity or to deter individual initiative but shall touch each aspect of gainful economic activity, and shall be calculated to enhance economic growth and technological advancement without favorable treatment for the rich or powerful."  In short, both Section 3553(a) and this hypothetical directive to the IRS say, in so may words, "You do it, but do it right!"  Without the mediating intervention of the Sentencing Guidelines (or an equivalent benchmark), Section 3553(a) is effectively no practical help in fashioning a sentence; without more, Section 3553(a) is fancy default.  Section 3553(a) neither prescribes nor prohibits a particular sentence any more than the hypothetical revenue code prescribes or prohibits any particular tax rate.  In contrast, the Sentencing Guidelines render the aims of Section 3553(a) comprehensible and manageably accessible to a sentencing judge.

Third, a "reasonable sentence" avoids the creation by a particular judge of an identifiable class of either favored or disfavored offenders or offenses, to which the judge systematically and repeatedly assigns an atypical sentence.  For example, a "reasonable sentence" conforms to the assessment of severity assigned to an offense in the first instance by Congress and later by the Sentencing Commission, which

assessments together implement Congress's constitutional authority to specify the elements of an offense and prescribe a penalty appropriate to the attendant circumstances of the offense and in the prevailing circumstances of the country (which is to say, for example, that a sale of methamphetamine in a nation with a history devoid of methamphetamine sale might provoke a congressional assessment of severity markedly different from a sale of methamphetamine in a nation falling prey to a virulent plague of methamphetamine, although the two presumed sales of methamphetamine are, in a limited sense, identical).  So, observing the congressional assessment of severity precludes a judge's, for example, assessing only probationary sentences in narcotics cases simply because the judge adheres vigorously to a studied belief (shared by informed and earnest advocates of disparate political persuasions) in de-criminalizing narcotics offenses and believes (for the reasons arrayed at 18 U.S.C. § 3553(a), at least as this hypothetical judge understands them) that prolonged incarceration in a "drug case" is unreasonable.  Similarly, observance of the congressional assessment of severity precludes a judge's assessing (for the reasons arrayed at 18 U.S.C. § 3553(a), at least as this hypothetical judge understands them) the maximum statutory penalty in every case of the sale of narcotics, a sentence prompted by the judge's observation of "crack babies" in the neo-natal intensive care unit of a local hospital, addicted teenagers in the local juvenile detention facility, and the abandoned children of addicted parents languishing in a downtown church's respite facility, all of which cements the judge's conclusion (shared by informed and earnest advocates of disparate political persuasions) that narcotics sales constitute an undeclared but unlimited war, conducted

against the next generation of Americans at the instance of international drug cartels in unrestrained pursuit of money and power.

Observing the congressional assessment of severity, as refined by the Sentencing Commission, avoids the mischief implicit in a judge's establishing, based upon individual conclusions that stand athwart the conclusions of Congress and the Sentencing Commission, categories of offenses and offenders that receive (and deserve, in the judge's singular view) a programmatically distinct sentence (either greater or lesser).  In truth, for a judge to independently designate categories of offenders and offenses for singular treatment is tantamount to the establishment of sentencing policy (as opposed to fixing a sentence, the nuanced application of existing policy to a particular offense or offender in an individual case).  However, neither an individual district judge nor a panel of appellate judges enjoys the authority to set sentencing policy for the United States, a power reserved to Congress and invested, in part, by statute in the Sentencing Commission.

As stated in Judge Selya's opinion (garnished, as always, by his delightful and exotic diction) in United States v. Pho, 2006 WL 20574 at *8 (1st Cir. 2005) (which appeared as this order neared completion):

> In our constitutional system, the power to define penalties for federal crimes belongs to the legislative branch of government, not the judicial branch. United States v. Evans, 333 U.S. 483, 486 (1948).  While federal courts possess the discretion to tailor individual sentences within the boundaries set by the statutory framework, that discretion is subject to the limitations imposed by Congress.  See Mistretta v. United States, 488 U.S. 361, 364 (1989).  The creation of the Sentencing Commission and the inauguration of a guideline sentencing scheme were valid exercises of congressional authority to fix penalties for federal crimes and, concomitantly, to cabin judicial discretion.

Stated simply, because a judge lacks authority to fix sentencing policy but bears authority to specify a sentence only in accord with Congressional directives, a "reasonable sentence" neither departs from congressional policy nor proceeds from a judge-made principle that establishes a class of either favored or disfavored offenders or offenses and, therefore, constitutes a prohibited attempt by the judge to arrogate to himself (and to dislodge from its rightful constitutional residence) the power to promulgate sentencing policy.  Needless to say, whether the judge disapproves of the sentencing policy of the United States is a matter of no consequence unless and until the judge's expressed reasons for the disapproval persuade the constituted authority to change the policy.  A judge may disapprove of the sentencing laws of the United States and a judge may articulate the disapproval powerfully to the public, but a judge may not renounce or defy the laws of the United States in imposing sentences (or doing anything else).[16]

Stated somewhat differently, a sentence manifestly lacks legitimacy if the sentence is premised upon policy fixed by a judge, i.e., a policy enforcing the will of a judge rather than the will of the people conveyed through legislative action.  The deprivation of liberty for a term sanctioned only by a single life-tenured judge, rather than sanctioned manifestly by a body of popularly elected legislators, lacks the reinforcement of deliberative legitimacy.  In fact, the sentencing regime before the

---

[16] In United States v. Angelos, 345 F. Supp.2d 1227 (D. Utah 2004), a powerful opinion both criticizing and enforcing the statute providing a consecutive and mandatory minimum sentence for possessing a firearm during the commission of a drug trafficking crime, Judge Paul G. Cassell exemplifies the district judge as informed dissenter from the effect of prevailing law, articulate advocate of improvement in the administration of justice, and conscientious constitutional officer of the United States.  Perhaps Judge Cassell's exemplary effort in Angelos will confirm the truth of the often-quoted statement from President Grant's first inaugural address that, "I know no method to secure the repeal of bad or obnoxious laws so effective as their stringent execution."

Sentencing Reform Act manifested precisely this deficiency because a too large range of permissible sentences both purported to sanction every single sentence within the range and, conversely, provided adequate sanction to no particular sentence within the range.  Again, neither judge nor justice (or a group of them or all of them in concert) enjoys the constitutional capacity to authorize for a term the deprivation of liberty (although the judge imposes the deprivation), a power exercised in a constitutional republic only by the body politic acting through elected representatives.  So, as the range of permissible sentences widens and as the proximity lessens between the imposed sentence and any legislatively prescribed sentence, the immediacy and consequent legitimacy of legislative sanction lessens apace.  For example, a legislative prescription for a stated offense of a range of imprisonment between zero and twenty years is not an effective legislative prescription of any particular sentence within the range and is without the capacity to legitimize any particular sentence because the range purports to legitimize two or more sentences that reason dictates are not possible, alternative, just sentences for the same offense.  In short, if a sentencing regime purports to legitimize both a sentence from one judge of five years and a sentence from another judge of twenty years for the same offense and an indistinguishable offender, the legislative authority has legitimized effectively neither sentence, even if both are within the stated range.

Viewing the array of pre-Sentencing Reform Act sentences from the vantage of a district judge, Judge Frankel found the sentences impermissibly disparate and lawless. From a slightly different vantage and with equal disapproval of the sentences, one might have identified the dominant defect as illegitimacy, ungoverned sentences imposed by

judges acting willfully without the legitimizing force of an ascertainable legislative prescription authorizing the deprivation of liberty for a time either certain or, at least, ascertainable and reasonably confined to a stated range.  Precisely this essential narrowing (although perhaps too great) follows the promulgation of the Sentencing Guidelines and lends unmistakable legislative legitimacy to every guidelines sentence. That legitimacy is systematically eroded by excursions away from the guidelines sentence, if the excursion is based on a judge's defiance of established policy and on the substitution and implementation of the judge's policy rather than on some articulated, singular, and pressing aspect of the case, the accommodation of which does not affront legislatively established policy.

A review of the opinions of some district judges (some of which opinions include, for example, excellent and studied elaboration of the forceful considerations gravitating against aspects of present sentencing policy) summons to mind an observation by the late Willmoore Kendall (a political scientist, commentator, and controversialist) in his (and George Carey's) The Basic Symbols of the American Political Tradition (Louisiana State Univ. Press, 1970):

> One of the virtues of a virtuous people . . . , one of the virtues that, as individuals, they must cultivate, is that of not expecting the political order . . . to reflect and act upon the beliefs that they, as individuals, hold most strongly.  They are free, as individuals, free over in the social order, to plead the case for the beliefs that they hold most strongly.  Unless they make solemn bores of themselves, we the people will listen to them.  They can try through the process of persuasion to build a consensus around their strongly held beliefs, but one virtue they must cultivate is that of not being in too much of a hurry, and another is not expecting other people, their neighbors, to give up ones right to their own strongly held beliefs.

A sentencing judge after <u>Booker</u> (at least for the moment) has both the immediate option and in many cases the temptation to venture repeatedly and systematically away from the advice of the Sentencing Guidelines in pursuit of policy that the judge perceives as compelling but that neither Congress nor the Sentencing Commission perceives as compelling.  Although the judge has both a splendid opportunity to formally publish criticism of sentencing policy and a duty to fashion a "reasonable sentence" in light of all the particulars of a case even if that sentence diverges somewhat from the advisory sentence, a disciplined and temperate judge in imposing a "reasonable sentence" will observe announced policy and heed the advice of the Sentencing Guidelines, while remaining alert to each aspect of a particular case that might compellingly suggest some divergence.  However, in each case the sentencing judge should heed history and practice restraint, recalling the primacy of Congress in establishing crimes and penalties, recalling Congress's rejection of the regime of discretionary sentencing, recalling Congress's careful establishment and supervision of the guidelines regime, and recalling that Congress retains the constitutional authority to imperatively arrange sentencing law to conform to congressional will.  Commenting on the tension among the branches of government, Professor Kendall observed that:

> We have a duty, if we are Supreme Court justices, not to force a showdown with Congress--not so much because we will lose, although we will, but because the political system held up to us by <u>The Federalist</u> obviously cannot survive such showdowns.

Kendall at 142.

Admittedly, the health of the republic is not threatened severely by the lineaments of sentencing, but it is a matter of consequence to the republic if constitutional officers

no longer regard the plenary arrangements of government with deference and delicacy,

preferring instead to make a run at commanding the pertinent scene, if only

ephemerally, until a greater force is mustered.  In truth, Congress in 1984 enacted a

statutory sentencing arrangement calculated to superimpose a formidable coordinating

paradigm on the unruly field of federal sentencing and, <u>Booker</u> notwithstanding, a

sentencing judge perforce the oath of the office owes Congress and the citizenry a

faithful approximation of that paradigm.

In sum, a "reasonable sentence" proceeds from an accurate calculation of the

advisory guidelines sentence; migrates from that calculated sentence only in the

demonstrable presence of an articulable, singular, and compelling attribute of the case

that persuasively but episodically mitigates, aggravates, distinguishes, or supersedes

the circumstances assumed in the guidelines sentence but offends no legislative

sentencing policy, which includes the policy of the Sentencing Commission; and creates

no identifiable class of favored or disfavored offenses or offenders, the establishment

and enforcement of which by a judge constitutes an impermissible exercise of the power

to set sentencing policy, a legislative prerogative.  Again, as stated by Judge Selya in

<u>Pho</u>:

> Congress has directed the Commission to devise policies that "avoid[]
> unwarranted sentence disparities," while at the same time providing
> "sufficient flexibility to permit <u>individualized sentences</u> when warranted by
> mitigating or aggravating factors."  28 U.S.C. § 991(b)(1)(B) (emphasis
> supplied).  The clear import of this statutory framework is to preserve
> Congress's authority over sentencing policy and to guarantee that the
> exercise of judicial discretion over sentencing decisions be based on case-
> specific circumstances, not on general, across-the-board policy
> considerations.

2006 WL 20574 at *9.[17]  In other words, a sentencing judge owes the legislative

authority the good faith enforcement of the law, a faithful approximation of the paradigm.

The district judge considering a "reasonable sentence" compares the calculated

guidelines sentence, which states a reasonable sentence for the set of offense and

offender characteristics assumed by the Sentencing Commission in stating the

guidelines sentence but which either assumes fewer than all the offense and offender

characteristics of any particular case that presents for sentencing or assumes a

characteristic only to an extent inadequate to capture the truth of the present case.

Accepting the legal and policy assessments of Congress and the Sentencing

Commission, the district judge examines the actual offense and the actual offender to

identify any attribute outside the contemplation of the Sentencing Guidelines or

inadequately contemplated by the Sentencing Guidelines.  The district judge remains

---

[17] Immediately after issuance of Pho, Professor Douglas Berman published commentary at "Sentencing Law and Policy," http://sentencing.typepad.com, an excellent and provocative forum widely consulted for current and trenchant analysis of sentencing issues.  Professor Berman states as part of his January 6th commentary that:

> [T]he Pho opinion elevates the perceived intent of Congress over the plain text of 18 U.S.C. § 3553(a), which the Booker Court identified as the guide for district court sentencing decisions and for circuit court review of whether a sentence is reasonable. (Where is a textualist like Justice Scalia when we need him?)

http://sentencing.typepad.com/sentencing_law_and_policy/2006/01/whats_wrong_wit.html.

Pho requires a district judge to conform to the Sentencing Guidelines' notorious 100:1 equivalency ratio between crack and powder cocaine; Professor Berman points to the aspirational language of 18 U.S.C. § 3553(a) as empowering a district judge to alter an unreasonable guidelines provision (the 100:1 ratio particularly).  Although Professor Berman's desire to ameliorate the consequences of the 100:1 ratio is entirely wholesome, Congress's more particular and immanent statutory creation of a Sentencing Commission with the authority (indeed, the duty) to promulgate regulations conforms to a pattern familiar in modern government:  primary interpretation of a statute entrusted to an agency empowered to promulgate interpretive regulations.  The Sentencing Commission is admittedly singular in many respects, but the interposition of a mediating authority between the district judge and the "vague" and "hopelessly open-ended" (see Judge Posner in Dean) provisions of Section 3553(a) provides a mechanism necessary to avoid a cacophonous report from the field of sentencing judges.

free to gauge the force of this attribute and adjust the guidelines' recommendation to account for the district court's appraisal of the force of this attribute.  In other words, the district court is free to transform the hypothetical and incomplete guidelines calculation into a reasonable sentence that answers each attribute of an actual offense and an actual offender.  The district judge is not free to establish sentencing policy, trump Congress or the Sentencing Commission, or exhibit the badges of sovereignty to which the office of judge is unentitled.

VI.

At his re-sentencing on January 6, 2006, and at earlier stages, Valencia-Aguirre argued for the imposition of a "reasonable sentence" below the calculated guidelines sentence.  Valencia-Aguirre focuses upon both the historical circumstances of his life in Colombia and the oppressive consequences to his family in the event of his lengthy imprisonment in the United States.  Valencia-Aguirre emphasizes that, as a mere child, he was compelled to enter the workforce by the merciless and relentless poverty long dominant in his region of Colombia, and he confirms that the survival of his family has depended on his obtaining and retaining employment, in latter years as a fisherman. Valencia-Aguirre accepted employment on this felonious overseas voyage because the pay offered the prospect of temporary relief for his immediate family, including his infant daughter, from the distress and anguish of their persistent and inclement circumstances.  A mere crewman on the voyage that led to his arrest, Valencia-Aguirre traveled under the supervision of others at all pertinent times.  He sailed without a detailed knowledge of the criminal enterprise of which he was part, the principals who employed him, or the persons or place toward which the voyage progressed.  Valencia-

Aguirre brought no particular knowledge or skill to his employment and contributed to the voyage nothing other than his presence and his capacity for manual labor, if needed.  To some extent, which varies from person to person (including among legislators and federal judges), Valencia-Aguirre's history, which stirs in the listener unease at the listener's probable course in equivalent circumstances, evokes both a palpable measure of human sympathy and a concomitant allowance for human frailty that seems (to say the least) to augur in favor of a more clement sentence.

On the other hand, Valencia-Aguirre received premium pay as an inducement to his undertaking as an ocean-going courier serving at the behest of and in behalf of a ruthless and bloody international cocaine industry.  Common sense distinctly disfavors the conclusion that the captains of the international cocaine industry, driven by the high octane fuel of cash, will casually entrust tens of millions of dollars worth of high purity cocaine into the roving custody of a crew of eight persons, any one of whose loyalty and seamanship is unproven or unreliable.  Of course, the two tons of cocaine aboard Valencia-Aguirre's vessel were due to be "cut" (or "stepped on," as the traffickers say) and to become not less than four tons of "street quality" cocaine before sale to retail consumers (including the children and other loved ones of Americans, whose views influence the establishment of the criminal laws).  The offense level of 38, assigned to Valencia-Aguirre by the Sentencing Guidelines, assumes only 150 or more kilograms of cocaine.  Obviously, Valencia-Aguirre's cocaine cargo was almost twelve times greater (until the dealers "step on" it) than the minimum amount necessary to qualify for an offense level of 38.  Probably neither Congress in enacting the pertinent statutes nor the Sentencing Commission in promulgating the pertinent guidelines considered the

condign punishment for the importation of two tons of high purity cocaine.  Nonetheless, along with offense level 38 and absent any confirmable criminal history, Valencia-Aguirre receives the dramatic benefit, perhaps deserved, of Criminal History Category I.  It suffices for the present purpose to note that, to some extent, which varies from person to person (including among legislators and federal judges), the history of Valencia-Aguirre's crime against the United States and its citizens, some of whom are highly vulnerable, evokes some measure, greater or lesser, of human fear for the health of our friends, our neighbors, and ourselves and prompts grim determination to restrain and defeat the perpetrators, all of which seems (to say the least) to augur in favor of a more punitive sentence.

Valencia-Aguirre presents a history in many respects typical of criminal cases.  He has encountered burdensome and disproportionate difficulties in life and his circumstances include innocents who depend upon him for subsistence in an embattled and depressed community.  Also, he has participated on an acutely large scale in a crime both directed against the well-being of a large number of persons in the United States and assessed as quite severe by the United States.  Representing the directed sense of the community (at whom the crime is directed and most of whom experience acute difficulty in their own lives and the lives of their loved ones), the legislative authority of the United States, in concert with a deliberative mechanism created for the purpose and guided by the provisions of 18 U.S.C. § 3553(a), has promulgated a proposed range of sentences established for a time as the recommended range of sentences for Valencia-Aguirre's crime.  Although in the exceptional case the search for a "reasonable sentence" may lead incrementally away from the recommended range,

Valencia-Aguirre's case offers no feature that demands an excursion outside the range established, which in this case implements 18 U.S.C. § 3553(a), if not singularly well, at least as well as any other sentence, but in either case with the legitimizing imprimatur of the legislative authority.

VII.

In consideration of these and other matters, including the pre-sentence report, the comments of the attorneys, and the statements by Valencia-Aguirre in allocution, I find that the sentence emanating from the Sentencing Guidelines adequately serves the objectives arrayed at 18 U.S.C. 3553(a), and I again sentence Valencia-Aguirre to two concurrent terms of 135 months' imprisonment, one term for each of the two counts of the indictment to which he plead guilty.  The details of the sentence were announced at the sentencing hearing.

ORDERED in Tampa, Florida, on January 9, 2006.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE